**SUPERIOR COURT**
**OF THE**
**STATE OF DELAWARE**

PAUL R. WALLACE
JUDGE

NEW CASTLE COUNTY COURTHOUSE
500 N. KING STREET, SUITE 10400
WILMINGTON, DELAWARE 19801
(302) 255-0660

Date Submitted: December 15, 2020
Date Decided: February 8, 2021

Bruce W. McCullough, Esquire
Bodell Bové, LLC
1225 N. King Street, Suite 1000
P.O. Box 397
Wilmington, Delaware 19899

Louis A. Bové, Esquire
Bodell Bové, LLC
1845 Walnut Street, Suite 1100
Philadelphia, Pennsylvania 19103

Timothy Jay Houseal, Esquire
Jennifer M. Kinkus, Esquire
Young Conaway Stargatt & Taylor, LLP
Rodney Square
1000 N. King Street
Wilmington, Delaware 19801

Susan J. Fields, Esquire
Jennifer M. Kokes, Esquire
Musick, Peeler & Garrett LLP
One Wilshire Building
624 South Grand Avenue
Suite 2000
Los Angeles, California 90017

RE:   *Zurich Am. Ins. Co. v. New York Marine and Gen. Ins. Co.*
      Civ. Act. No. N19C-09-288 PRW CCLD

Dear Counsel:

This Letter Order addresses the Zurich American Insurance Company's

Motion for Partial Summary Judgment on Count One (Declaratory Relief) of its

Second Amended Complaint. For the reasons set forth below, that motion is

**DENIED.**

## I. INTRODUCTION

This case involves the insurance coverage of MGM Resorts International, Mandalay Bay, LLC, Mandalay Resorts Group, MGM Resorts Festival Grounds, LLC ("MRFG"), MGM Resorts Venue Management, LLC, and their respective affiliates (collectively, "the MGM entities"), relating to the deadliest mass shooting committed by a single person in United States' history. That tragedy occurred a few years ago in Las Vegas at the Route 91 Harvest Music Festival ("the Event"). Governing the disputed insurance coverage is the Festival Agreement ("the Agreement") between MRFG and Country Nation, LLC. As required by the Agreement, each party obtained commercial general liability ("CGL") policies naming the other party and its affiliates as additional insureds. Plaintiff Zurich American Insurance Company and Defendant New York Marine and General Insurance Company are the issuers for the parties' respective policies.

Zurich American filed this action bringing claims for declaratory relief and breach of contract. Before the Court is Zurich American's Motion for Partial Summary Judgment through which it seeks declaratory judgment that New York Marine has a duty to defend the MGM entities for third-party claims arising out of the Event and that the Zurich American policy is excess and non-contributory. For the reasons that follow, Zurich American's Motion is **DENIED**.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

Zurich American is an insurance company that issued a CGL policy to the MGM Entities.[1]  New York Marine is an insurance company that issued a CGL policy to Live Nation Worldwide, Inc.[2]

On or about July 25, 2014, MRFG and Country Nation, LLC ("Country Nation") ("Live Nation" in the Agreement), entered into an agreement where MRFG granted a temporary license to Live Nation to use the premises known as "MGM Resorts Village" to co-promote the Event.[3]  The Agreement contained defense, indemnity, and insurance requirements for both parties.[4]

The Agreement required both parties to obtain insurance policies that named the other party and their parent companies, subsidiaries, and affiliates as additional insureds.[5]  The Agreement expired on December 31, 2016.[6]  Though created on

---

[1]  Second Am. Compl. ¶ 7, Dec. 3, 2019 (D.I. 7) (hereinafter "Sec. Am. Compl.").

[2]  *Id.* ¶¶ 2, 8.

[3]  Sec. Am. Compl. Ex. A (Festival Agreement).

[4]  *Id.* §§ 2.8, 2.9; Sec. Am. Compl. Ex. C (Live Nation Notice of Joinder to MGM).

[5]  Sec. Am. Compl. Ex. A, § B, ¶¶ 1, 2.

[6]  Sec. Am. Compl. Ex. A.

March 20, 2017, the Second Amendment to the Agreement was not signed by either party.[7]

Effective June 20, 2017 through October 5, 2017, New York Marine issued Policy No. PK201700011092 to named insured "Live Nation Worldwide, Inc."[8] The New York Marine policy includes, as additional insureds ("AIs"), any person or organization agreeing in writing that such person be added prior to performance.[9]

Effective July 1, 2017 through July 1, 2018, Zurich American issued Policy No. GLO 4279885-09 to named insured "MGM Resorts International."[10] The Zurich American Policy contains a Self-Insured Retention ("SIR") endorsement that conditions coverage upon the exhaustion of a $500,000 retention.[11]

On October 1, 2017, Stephen Paddock opened fire from his hotel suite on the 32nd floor of the Mandalay Bay Hotel into the crowd of people attending the Event

---

[7] Pl.'s Opening Br. Ex. K (Second Amendment to Festival Agreement) Aug. 3, 2020 (D.I. 26) (hereinafter "Pl. Open. Br.").

[8] Sec. Am. Compl. Ex. B (New York Marine Policy).

[9] Sec. Am. Compl. Ex. B, NYM–LN 203.

[10] Def.'s Answering Br. Ex. L, ¶ 16 (Third-Party Suit Complaint) Sept. 14, 2020 (D.I. 40) (hereinafter "Def.'s Ans. Br."); Sec. Am. Compl. Ex. J (Zurich American Policy).

[11] Sec. Am. Compl. Ex. J, Self Insured Retention Endorsement.

at the Las Vegas Village.[12]  Shortly after the shooting incident, several thousand Event patrons and their relatives sued or indicated an intent to sue Live Nation and MGM.[13]  The complainants asserted negligence claims against Live Nation and MGM for causes of action including, but not limited to, (1) breached duty of care while operating the Hotel premises and (2) breached duty of care to protect and safeguard persons on the Las Vegas Village premises.[14]

Immediately after the shooting, Live Nation requested a defense from New York Marine and New York Marine agreed to defend Live Nation.[15]  On December 14, 2018, Zurich American informed Live Nation and New York Marine it was reserving all rights available under the New York Marine policy, including rights to seek equitable contribution, equitable subrogation, and defense costs.[16]  On January 23, 2019, Live Nation replied, stating Zurich American had no basis to (1) claim

---

[12]  Sec. Am. Compl. Ex. D, ¶¶ 18-19; Ex. E, ¶¶ 17-18; Ex. F, ¶¶ 462-463; Ex. G, ¶ 30; Ex. H, ¶ 12; Ex. I, ¶¶ 22-23 (Third-Party Suit Complaints).

[13]  Sec. Am. Compl. Ex. D-I.

[14]  Sec. Am. Compl. Ex. D, ¶¶ 25-26; Ex. E, ¶¶ 24-25; Ex. F, ¶¶468-469; Ex. H, ¶ 50; Ex. I, ¶ 36.

[15]  Def.'s Ans. Br. Decl. Thomas Jambor in Supp. Def. Opp'n to Mot. for Partial Summ. J. ¶¶ 6-7, Sept. 14, 2020 (D.I. 40) (hereinafter "Jambor Decl.").

[16]  Def.'s Ans. Br. Ex. M (Zurich American Reservation of Rights Letter).

coverage for MGM as an additional insured or (2) seek indemnity from Live Nation.[17]

### A. PROVISIONS RELATED TO PRE-TENDER DEFENSE COSTS

Section IV of the New York Marine policy contains a no-voluntary-payments provision. Under section IV(2)(b), "No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than first aid, without our consent."[18]

### B. PROVISIONS RELATED TO THE AGREEMENT AMENDMENT

Under Section 2(a) of the Second Amendment to the Agreement—that unsigned document dated March 20, 2017—"MRFG and Live Nation hereby agree that the Term of the Agreement as set forth in Section 1.1 shall be extended for an additional three (3) year period and the Term shall continue through and include December 31, 2019."[19]

---

[17]  Def.'s Ans. Br. Ex. O (Live Nation Reply Letter).

[18]  Sec. Am. Compl. Ex. B, NYM–LN 194.

[19]  Pl.'s Open. Br., Ex. K.

### III.  PARTIES' CONTENTIONS

In support of its Motion for Partial Summary Judgment in the form of declaratory relief, Zurich American contends (1) the MGM entities are AIs under the New York Marine policy, (2) the Event lawsuits triggered New York Marine's duty to defend, (3) New York Marine owes a primary and non-contributing duty to defend the MGM entities, and (4) Zurich American is entitled to the reimbursement of post-notice defense costs.  Zurich American then asks that the Court declare that (1) New York Marine was obligated to immediately defend the MGM entities from claims arising out of the Event on a primary and non-contributing basis and (2) the Zurich American policy is excess to and non-contributing with the New York Marine policy regarding defense obligations in favor of the MGM entities.

In opposition, New York Marine says (1) the MGM entities do not qualify as AIs, (2) New York Marine owed no duty to defend because the MGM entities never tendered their defense, (3) the New York Marine policy is not primary and non-contributing, and (4) New York Marine owes no duty to pay pre-tender defense costs.

### IV.  STANDARD OF REVIEW

Summary judgment will be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[20]  On a motion for summary judgment, the Court views the facts in the light most favorable to the non-moving party.[21]  And the moving party bears the burden of demonstrating there are no genuine issues of material fact.[22]

The Court's principal function when considering summary judgment is to examine the record to determine whether genuine issues of material fact exist, "but not to decide such issues."[23]  Summary judgment will be granted if, after viewing the record in a light most favorable to a non-moving party, no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.[24] If, however, the record reveals that material facts are in dispute, or if the factual record has not been developed thoroughly enough to allow the Court to apply the

---

[20]   Del. Super. Ct. Civ. R. 56(c).

[21]   *Id.*

[22]   *Charlton v. Wal-Mart Stores, Inc.*, 2008 WL 5206775, at *1 (Del. Super. Ct. Nov. 25, 2008).

[23]   *Merrill v. Crothall–American Inc.*, 606 A.2d 96, 99–100 (Del. 1992) (internal citations omitted); *Oliver B. Cannon & Sons, Inc. v. Dorr–Oliver, Inc.*, 312 A.2d 322, 325 (Del. Super. Ct. 1973).

[24]   *Id.*

law to the factual record, then summary judgment will not be granted.[25] The moving party bears the initial burden of demonstrating that the undisputed facts support his claims or defenses.[26] If the motion is properly supported, then the burden shifts to the non-moving party to demonstrate that there are material issues of fact for the resolution by the ultimate fact-finder.[27]

## V. CHOICE OF LAW

Zurich American agrees with New York Marine's suggestion that California law should be applied here. And California satisfies the *Second Restatement*'s "most significant relationship analysis" followed by Delaware.[28] The *Second Restatement*'s § 188 identifies five factors a court uses to decide which state has the most significant relationship to an issue:

(a) The place of contracting,

(b) The place of the negotiation of the contract,

(c) The place of performance,

---

[25] *Ebersole v. Lowengrub*, 180 A.2d 467, 470 (Del. 1962); *see also Cook v. City of Harrington*, 1990 WL 35244 at *3 (Del. Super. Ct. Feb. 22, 1990) ("Summary judgment will not be granted under any circumstances when the record indicates . . . that it is desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances." (citing *Ebersole*, 180 A.2d at 467)).

[26] *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1970) (citing *Ebersole*, 180 A.2d at 470)).

[27] *See Brzoska v. Olsen*, 668 A.2d 1355, 1364 (Del. 1995).

[28] Restatement (Second) of Conflicts of Laws § 188 (Am. Law. Inst. 1971). This opinion will refer to it as the *Second Restatement* throughout.

(d) The location of the subject matter of the contract, and

(e) The domicil, residence, nationality, place of incorporation and place of business of the parties.[29]

While Delaware courts use general policy considerations for determining which state has the most significant relationship, the *Second Restatement* provides specific presumptions.[30] For insurance contracts, § 193 presumes the law of the state "which the parties understood was to be the principal location of the insured risk" should apply. Here, Live Nation has its personal place of business in California. All lawsuits identified in the complaint were filed in California. The New York Marine policy was negotiated, underwritten, and issued in California. There are fewer connections to Delaware: Live Nation is incorporated in Delaware and New York Marine is registered to conduct business in Delaware. So, these facts demonstrate (1) under § 193, at the time of the negotiation of the New York Marine policy, the parties understood California was the principal location of the insured risk and (2) under § 188, California bears the most significant relationship. And so, the Court applies California law here.

---

[29] *Id.*

[30] *Certain Underwriters at Lloyds, London v. Chemtura Corp.*, 160 A.3d 457, 465 (Del. 2017).

## VI. LEGAL ANALYSIS

### A. THERE IS A GENUINE DISPUTE OF MATERIAL FACT WHETHER THE DUTY TO DEFEND WAS TRIGGERED.

Zurich American argues that the moment the underlying suits were filed, New York Marine's duty to defend was triggered because they addressed MGM's potential liability for a "bodily injury" caused.[31] New York Marine counters that triggering the duty to defend requires tender—a more stringent standard than the mere notice requirement Zurich American posits. And New York Marine says that Zurich American did not abide by that tender requirement.[32]

Under California law, the duty to defend arises when an insured tenders defense of a third-party lawsuit to an insurer.[33] An insurer's duty to defend might arise before the insured demands a defense, however, if the insurer has independent knowledge of the potential for coverage.[34] Similarly, an insurer's duty to defend may arise upon receiving constructive notice of the insured's need for defense.[35]

---

[31] Pl.'s Open. Br. 14.

[32] Def.'s Ans. Br. 21-22.

[33] *OneBeacon Am. Ins. Co. v. Fireman's Fund Ins. Co.*, 95 Cal. Rptr. 3d. 808, 821 (Cal. Ct. App. 2009) (citing *Truck Ins. Exch. v. Unigard Ins. Co.*, 94 Cal. Rptr. 2d 516, 523 (Cal. Ct. App. 2000)).

[34] *Samson v. Transamerica Ins. Co.*, 636 P.2d 32, 44 (Cal. 1981).

[35] *Cal. Shoppers, Inc. v. Royal Globe Ins. Co.*, 221 Cal. Rptr. 171, 189 (Cal. Ct. App. 1985) (holding constructive notice occurs when insured sends insurer a copy of the summons and

Constructive notice occurs when the insurer has adequate notice of the potential for contribution and the opportunity for investigation and participation in the defense of the underlying litigation.[36] In duty-to-defend cases involving co-insurers, constructive notice should be made promptly after the co-insurer seeking contribution agrees to provide a defense.[37]

Here, Zurich American hasn't yet presented evidence demonstrating New York Marine had adequate notice of the potential for contribution and the opportunity for investigation and participation in the defense of the underlying litigation. And Zurich American's mere suggestion of what constituted "notice" here just doesn't work. Certainly, international news organizations broadcasted the Event. But there is certainly no reasonable inference they broadcasted the details of the insurance coverage and potential liability of those entities involved. There are no facts in the record demonstrating that New York Marine was aware of Zurich

---

complaint naming the insured as defendant because diligent inquiry would reveal tender came from the insured).

[36] *Unigard*, 94 Cal. Rptr. 2d at 525 (holding constructive notice does not occur when insured investigates and settles underlying litigation because the imposition of contribution on a stranger to the litigation would subject it to a significant financial burden without enjoying any of the concomitant benefits); *See also OneBeacon Am. Ins. Co.*, 95 Cal. Rptr. 3d at 823.

[37] *Unigard*, 94 Cal. Rptr. 2d at 527.

American's defense of the MGM entities until December 14, 2018, when Zurich American sought equitable contribution.[38]

Moreover, Zurich American has continuously provided a defense since the incident on October 1, 2017. Zurich American has presented no evidence that, over multiple years of that defense, New York Marine has participated in and controlled the defense strategy in the underlying actions. With the available facts, the imposition of contribution on New York Marine would subject it to a $30 million burden without affording it the concomitant benefit of participating in and controlling any part of the defense. With no evidence that New York Marine participated in and controlled the defense, the Court cannot grant summary judgment as a matter of law.[39]

In sum, there is a genuine dispute of material fact concerning whether (1) the Event by itself constitutes constructive notice and (2) New York Marine participated and controlled the defense of the MGM entities. In turn, the Court cannot grant, on summary judgment, the declaration Zurich American seeks.

---

[38] For instance, there is no evidence Zurich American sent New York Marine a copy of the summons and complaint naming a Zurich American insured as a defendant to any action. *E.g.*, *Cal. Shoppers, Inc.*, 221 Cal. Rptr. at 189 (insurer found to have had constructive notice when the insured sent a copy of the summons and complaint naming the insured as the defendant).

[39] *See Unigard*, 94 Cal. Rptr. 2d at 525.

### B. THERE IS A GENUINE DISPUTE WHETHER NEW YORK MARINE OWES PRE-TENDER DEFENSE COSTS.

Zurich American contends that New York Marine cannot avoid paying pre-tender defense costs because the Event's worldwide attention satisfied the New York Marine policy's notification-of-occurrence requirement.[40] New York Marine counters that it owes no duty to pay pre-tender defense costs because specific policy language bars coverage for such costs.[41]

In a duty-to-defend dispute, insurance policies that contain "no-voluntary-payments" provisions bar reimbursement for pre-tender expenses.[42] Only when the insured has requested and been denied a defense might it overcome a policy's no-voluntary-payments provision.[43] Where the insured has failed to demand a defense and relinquish control over the case, it cannot expect pre-tender voluntary payments, expenses, or other obligations incurred without the insurer's consent.[44]

Even where a policy contains a no-voluntary-payments provision, however,

---

[40] Pl.'s Open. Br. 29.

[41] Def.'s Ans. Br. 30.

[42] *Tradewinds Escrow, Inc. v. Truck Ins. Exch.*, 118 Cal. Rptr. 2d 561, 565 (Cal. Ct. App. 2002).

[43] *Unigard*, 94 Cal. Rptr. 2d at 527.

[44] *Id.*

pre-tender expenses are not barred when incurred involuntarily.[45]  Payments might be deemed involuntary if circumstances of the case show the payments were out of the insured's control.[46]  Circumstances that show involuntariness include (1) when the insured is unaware of the identity of the insurer or the contents of the policy and (2) the insured must respond to the lawsuit to avoid default.[47]  Similarly, the provision might not apply when the urgency of time pressures requires the insured to expend money pre-tender under duress.[48]

The New York Marine Policy provides in Section IV(2)(d): "No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than first aid, without our consent."[49]  This is

---

[45]   *Tradewinds Escrow, Inc.*, 118 Cal. Rptr. 2d at 566.

[46]   *Jamestown Builders, Inc. v. Gen. Star Indem. Co.*, 91 Cal. Rptr. 2d 514, 518 (Cal. Ct. App. 1999).

[47]   *See Shell Oil Co. v. Nat'l Union Fire Ins. Co.*, 52 Cal. Rptr. 2d 580, 589 (Cal. Ct. App. 1996) (holding no-voluntary-payments provision does not apply when the insured is unaware of the insurer's identity or contents of the policy because the payments could not be characterized as voluntary); *Fiorito v. Superior Court*, 277 Cal. Rptr. 27, 30-31 (Cal. Ct. App. 1990) (holding no-voluntary-payments provision did not preclude insureds from seeking recovery of pre-tender defenses costs when the insured responded to the lawsuit to avoid default because the voluntariness of the payments presented a triable issue).

[48]   *Tradewinds Escrow, Inc.*, 118 Cal. Rptr. 2d at 566 (holding no-voluntary-payments provision applies when insured first tendered defense 17 months after incurring expenses because there were no facts in the record that demonstrated it was under duress before tendering the claim).

[49]   Sec. Am. Compl. Ex. B, NYM–LN 194.

a no-voluntary-payments provision.  And to obtain reimbursement for its pre-tender defense costs, Zurich American must show that this provision does not apply.  Zurich American might be able to do so if it can show that its payments were either involuntary or made under duress.

Despite having multiple opportunities to do so, Zurich American has failed to plead that the $30 million it claims to have paid to defend the MGM entities was paid involuntarily.  And Zurich American, as yet, reveals no evidence its payments were involuntary.  Zurich American is a global insurance provider and had ample time to review the Agreement and the ensuing policies—it knew of the identity of the insurer it now pursues.[50]

Nor has Zurich American presented any evidence that its defense was necessary to protect legal interests.[51]

And the current record does not evidence that Zurich American was under any kind of duress before tendering the claim to New York Marine.  After the Event, Zurich American waited 14 months before informing Live Nation and New York Marine of its reservation of rights to seek equitable contribution or subrogation.

---

[50]  *Compare Shell Oil Co.*, 52 Cal. Rptr. 2d at 589.

[51]  *See, e.g., Fiorito*, 277 Cal. Rptr. at 30-31 (insureds were permitted to present evidence to prove their response to the lawsuit was to avoid default).

Zurich American does little to explain its initial failure to tender. And given the continuous delay in tendering, one imagines it will be difficult for Zurich American to demonstrate any form of duress.[52]

In short, at this point, the Court sees a genuine dispute of material fact as to whether Zurich American's defense of MGM was involuntary or under duress. And with no evidence demonstrating Zurich American's payments of pre-tender defense costs were involuntary or made under duress, the Court is unable to grant the summary judgment Zurich American seeks.

## C. THERE IS A GENUINE DISPUTE OF MATERIAL FACT WHETHER THE WRITTEN AGREEMENT WAS EXTENDED.

Zurich American argues that the condition precedent to afford coverage to additional insureds under the New York Marine policy is satisfied by the Agreement.[53] New York Marine counters that the Agreement does not satisfy the condition precedent because the written Agreement expired and the Amendment extending the Agreement was never signed.[54]

---

[52] *See, e.g., Tradewinds Escrow, Inc.*, 118 Cal. Rptr. 2d at 566-67 (no duty to defend when the insured offered no explanation for the 17-month delay before tendering).

[53] Pl.'s Open. Br. 12.

[54] Def.'s Ans. Br. 12.

Insurance policies are construed under the same rules that govern the interpretation of other contracts.[55] Policies must be interpreted to give effect to the mutual intent of the parties at the time of contracting.[56] Mutual intent is ascertained from the "clear and explicit" language of the contract.[57] If contractual language is clear and explicit, it governs.[58] When interpreting a policy provision, the Court must give its terms their "ordinary and popular sense," unless used by the parties in a technical sense or special meaning is given to them by usage.[59]

A policy provision is ambiguous only if it is susceptible to two or more reasonable constructions despite the plain meaning of its terms.[60] Ambiguity is viewed within the context of the policy as a whole.[61] If there are two or more reasonable constructions, the Court may invoke the principle that ambiguities are

---

[55] *St. Paul Mercury Ins. Co. v. Frontier Pac. Ins. Co.*, 4 Cal. Rptr. 3d 416, 424 (Cal. Ct. App. 2003).

[56] *Id.*

[57] *St. Paul Fire & Marine Ins. Co. v. Am. Dynasty Surplus Lines Ins. Co.*, 124 Cal. Rptr. 2d 818, 825 (Cal. Ct. App. 2002).

[58] *Id.*

[59] Cal. Civ. Code § 1644 (West 2020).

[60] *Fireman's Funds Ins. Companies v. Atl. Richfield Co.*, 115 Cal. Rptr. 2d 27, 29 (Cal. Ct. App. 2001) (citing *Palmer v. Truck Ins. Exch.*, 988 P.2d 568, 652-53 (Cal. 1999)).

[61] *Id.*

generally construed against the party who caused the uncertainty to exist to protect the insured's reasonable expectation of coverage.[62]  When additional insured endorsements, by their own terms, depend on the existence of a written contract between the named insured and the additional insured, the contract is significant to determining the objectively reasonable expectations of the additional insured.[63]

When a contract specifies its duration, it terminates on the expiration of that specified period.[64]  Terminated contracts will not bind parties and cannot—by mere will or simple fiat—be extended or modified.[65]  No, to extend or modify a terminated contract, a new contract must be executed.[66]  A new contract may be implied-in-fact when it consists of obligations arising from a mutual agreement and intent to promise where the agreement and promise have not been expressed in words.[67]  The existence

---

[62]  *La Jolla Beach & Tennis Club Inc. v. Indust. Indem. Co.*, 884 P.2d 1048, 10539 (Cal. 1994).

[63]  *St. Paul Mercury Ins. Co.*, 4 Cal. Rptr. 3d at 426.

[64]  *Citizens for Amending Proposition L v. City of Pomona*, 239 Cal. Rptr. 3d 750, 775 (Cal. Ct. App. 2018) (citing *Beatty Safeway Scaffold, Inc. v. Skrable*, 4 Cal. Rptr. 543, 545 (Cal. Ct. App. 1960)).

[65]  *Citizens for Amending Proposition L*, 239 Cal. Rptr. 3d at 775-76.

[66]  *See id.* ("A terminated contract cannot be extended or modified; both extension and modification as those terms are commonly understood presupposed the existence of a valid contract to extend or modify.").

[67]  Cal. Civ. Code § 1621 (West 2020); *See id.*

and scope of implied-in-fact contracts are determined by the totality of the circumstances.[68]

The parties do not dispute that the Agreement is a valid contract. But New York Marine does contend that based on the plain language of the New York Marine policy, an agreement with someone other than the named insured does not satisfy the requirements of the AI endorsement. Put differently, because Country Nation is not a named insured in the New York Marine policy, the Agreement between MRFG and Country Nation does not satisfy the requirements of the AI endorsement.

New York Marine's efforts to distinguish between Country Nation and Live Nation are unavailing. At the outset, the Agreement states that Country Nation will be referred to as "Live Nation" throughout.[69] The Agreement also requires notice sent to Brian O'Connell, a representative of Touring & Festivals at Live Nation Nashville.[70] Looking in its entirety, the plain language indicates that Live Nation is a party to the Agreement. Therefore, there is no genuine dispute of material fact that there was a written agreement between Live Nation and MRFG that satisfies the

---

[68] *Faigin v. Signature Grp. Holdings, Inc.*, 150 Cal. Rptr. 123, 134 (Cal. Ct. App. 2012).

[69] Sec. Am. Compl. Ex. A.

[70] *Id.* § 2.14.

requirements of the AI endorsement.

That said, Zurich American has not satisfied its burden to show there is no genuine issue of material fact first as to whether the Second Amendment to the Festival Agreement created an implied-in-fact contract. And while the Agreement itself does not require a written extension, the New York Marine Policy conditions coverage on a written agreement between the policy holder and the additional insured. The Agreement in this case expired on December 31, 2016, indicating the operative agreement was terminated.[71] The parties created the Second Amendment to Agreement on March 20, 2017, but as best the Court can tell, never signed it.[72] Without signatures from either party, one very reasonable inference is that the Amendment is a draft and unenforceable.

Determining the existence of an implied-in-fact contract is reserved for the trier of fact unless the undisputed facts can only support one reasonable conclusion.[73] Here, there are two reasonable conclusions: (1) the Second Amendment extended

---

[71] *Id.* § 1.1(a).

[72] Pl. Open. Br. Ex. K.

[73] *Faigin*, 150 Cal. Rptr. at 134.

the Agreement as suggested by the Baldizan Declaration[74] or (2) the Agreement expired and the Second Amendment was an unenforceable draft. If the Agreement was terminated, there remains a factual question as to whether there was an implied-in-fact contract. Given the preference for fact-intensive inquiry during implied-in-fact contract disputes and the Amendment's lack of signatures, summary judgment is inappropriate because there is a genuine issue of material fact regarding whether the Second Amendment to the Festival Agreement is enforceable.

The very nature of summary judgment is finality: under Rule 56(c), summary judgment is appropriate only if "the moving party is entitled to judgment as a matter of law."[75] In order to be entitled to a judgement as a matter of law, Zurich American must demonstrate there are no lingering questions or disputes of material fact. Here,

---

[74] Even the Baldizan Declaration leaves information to be desired. First, the Declaration states, "Each year starting in 2014, the Route 91 Harvest Festival was co-promoted by Live Nation and MGM, pursuant to the terms of the July 25, 2014 Festival Agreement . . ." Decl. of Christopher Baldizan Regarding Mot. for Partial Summ. J., Aug. 28, 2020 (D.I. 35) (hereinafter "Baldizan Decl."). The Baldizan Declaration fails to satisfy the New York Marine Policy's written agreement requirement. Also, "Each year starting in 2014" is not so obvious an indication that the only reasonable interpretation is that both parties agreed to extend the Agreement. Second, when asked if he signed the Second Amendment yet, Baldizan sent an email saying, "No. I forwarded to Amy and let her know my thoughts based on my conversation with BOC. She is on holiday until Oct 20, so we will get them finalized then." Def.'s Ans. Br. Ex. Q, at 4. The email does not distinguish whether "them" refers to the Amendment, the Agreement, or both. There has been no evidence that the MGM representative finalized the Amendment. Based on the plain language of the statement, one reasonable interpretation of the e-mail is that the Amendment's finalization was contingent on the MGM's representative review and approval, which did not occur.

[75] Del. Super. Ct. Civ. R. 56(c).

there is a genuine issue as to whether an agreement even exists—an issue that must be resolved before determining New York Marine's duty to defend and pay pre-tender costs. Given the stage of the proceedings and the state of the record, the Court can enter no final judgment for Zurich American as a matter of law. Any offset now, before the Court even determines if there is a valid written agreement between the MGM entities and Live Nation, is premature. It is not just desirable, but necessary, to inquire more thoroughly into the facts in order to clarify the application of law to these circumstances.

## VII. CONCLUSION

For the foregoing reasons, Zurich American's motion for summary judgment is **DENIED**.

**IT IS SO ORDERED.**

_____

**Paul R. Wallace, Judge**